IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

ZACHARY JENSON,

    Defendant.

No. S-Mag 06-0021 GGH

CR-S-06-0035 MCE

ORDER

/

*Introduction and Summary*

    Defendants in this action, Eric Mc David, Zachary Jenson, and Lauren Weiner have been charged by complaint with conspiracy (18 U.S.C. § 844(n)) to violate 18 U.S.C. § 844(f)(1) (destruction by explosion or fire of United States real property) and § 844(i) (destruction of a building etc. by explosion or fire when said property was used in interstate commerce). On January 25, 2006, an indictment was returned against these defendants alleging the same charge with the exception that subsection (f) generally was described in the indictment. The background to the alleged conduct is defendants' actions in concert with, or in sympathy with, the aims of the Earth Liberation Front (ELF), a movement dedicated to destroying property (and at times, people) associated with activities at odds with the ELF's ideas of what is good for the environment.

All defendants have sought release on bail and conditions. The United States strenuously urges that all defendants be detained as flight risks and dangers to the community if released. The court finds in this order that defendant Zachary Jenson be **detained** as a flight risk and danger to the community.

*Facts Common to All Defendants*

The great weight of evidence thus far, as set forth in the Complaint affidavit and as produced at defendant Weiner's detention hearing, clearly indicates that all three defendants engaged in the aforementioned conspiracy to attempt destruction of one or more proposed targets in the greater Sacramento metropolitan area and/or El Dorado County. According to the complaint, the three defendants and an undercover, paid FBI source rendezvoused in a residence in Dutch Flat located in Placer County. Unbeknownst to the defendants, the house obtained by the informant and the informant were wired to record their conversations. These conversations included debates on the "best" target, a statement from defendant McDavid that "human casualties would be acceptable," discussions on how to create explosive devices, and how defendants planned to go underground after completion of their criminal deeds. Defendants also engaged in preparatory activities (along with the sometimes facilitation by the informant) with the view of accomplishing their destructive aims such as reconnaissance of at least two potential targets, acquisition of bomb making "recipes," and purchase of materials with which to make explosive devices. All three defendants actually initiated a cooking of bleach in order to commence bomb making activities.

While this group of defendants may not have possessed a polished expertise in explosives and their use in blowing up targets, there is no doubt from the evidence presented thus far that defendants were deadly serious in their intent to wreak destruction on some type of target which they believed would make a statement in favor of their anti-government, anti-corporate, allegedly pro-environment cause. It is also apparent, that regardless of expertise, defendants, if not stopped, would have set off some type of explosive device with the risk to human life

possible, but which risk is quantitatively unascertainable at this point.

The government also spent some time at Weiner's detention hearing in attempting to link defendants to primarily the ELF, and also the ALF (Animal Liberation Front). These organizations were characterized by the government's expert as leaderless, for the most part structureless, "movements" comprised of individual, autonomous cells. The cells kept in loose contact with each other via websites, and gatherings at protest sites. These cells shared some common goals, e.g., throwing off government control, anti-corporate philosophy, "protecting" the environment and non-human organisms/creatures within the environment, but the overall organization apparently has no constitution, bylaws or rigid, binding dogma. Members of cell groups may support members of other groups out of supposed common purpose. However, other than statement(s) by McDavid that the groups criminal actions should be attributed to ELF, no evidence directly linking defendants to this movement was produced. Nevertheless, the aims of these defendants relate in a general fashion to the testified about aims of the ELF.

The government did produce evidence at the Weiner hearing that defendants were visited in jail by members of some type of support group perhaps affiliated (in a very loose way) with the ELF movement. Evidence of criminal intent by this group in terms of aiding some type of absconding if released was not thus far produced, but it is curious that members of what will be termed a "support group" were instantly aware of defendants' incarceration, and nearly instantaneously visiting defendants.

*Facts Regarding Defendant Jenson*

Defendant Jenson is of a similar age as defendant Weiner. But the similarity of their pre-conspiracy backgrounds ends there for the most part. Jenson left home in approximately June 2004 when, according to Pretrial Services, Jenson's mother "put him on a bus to attend an environmental protest in Georgia." Thereafter, Jenson had only very sporadic in person contact with his mother, and apparently, no contact to speak of with his father. Jenson spent the remainder of 2004 and 2005 traveling except for an extended period when he remained

3

in Shoreline Washington, with friends. Jenson was listed as one of 18 friends of Weiner on Weiner's webpage. Not much is known about Jenson's travels except that he met up with defendants at some time during this period, and that he was essentially a vagabond when traveling.

Jenson also had a webpage (under the pseudoname "Ollie Aucksen") in which he described his occupation as "wanderer/drug addict/assasin." He also alludes to drug use[1] and a certain fascination with a "Mr. Punch." In connection with the suggested place for his residence while on pretrial release, Jenson related: "i hate tenessee. with a passion." Jenson also talks about "the panda," which the government associates with Jenson's protest activities in Northern California. Many of the entries on the webpage appear to be hyperbolic, and of not much sense to this observer. See Government Exhibits 4 and 5.

In terms of his participation in the charged offense, Jenson was described by the F.B.I. case agent as being the least verbal of the three and not as animated. Jenson was purported to be the designated public relations person for the group, i.e., the person who would write the statement accepting responsibility on behalf of ELF or some other group for the proposed bombing(s). Nevertheless, the log of surveilled and recorded conversations (Government Exhibit 7) shows Jenson actively involved in the planning and actions within the conspiracy. For example:

(1) on January 8, 2006 (page 116) "McDavid, Jenson, Weiner, and Source referenced, targeting billboards and cell phone towers. All subjects talked also about escalating the type of targets as they went along."

(2) January 10, 2006 (page 137) Jenson suggests testing a diesel fuel bomb in the desert.

(3) January 10, 2006 (page 139) Jenson suggests that an alibi is needed.

---

[1] Jenson's drug use was confirmed in the transcribed summary of recorded conversations, Govt. Exhibit 7.

(4) January 10, 2006 (page 140) Jenson seeks information on chemicals associated with explosives.

(5) January 10, 2006 (page 141) Jenson states that he likes that they have multiple [explosives] recipes.

(6) Id. Jenson talks about copper tubes for shrapnel.

(7) January 12, 2006 (page 158) Jenson suggests that the group focus on one target instead of four and suggests that a power station be the first target.

Jenson, like Weiner, has no past, recorded criminal history.[2]

Unfortunately for Jenson, his relatives have no property that they desire to post for him as security for appearances or other conditions. Counsel for Jenson suggests third party custody in Tennessee with his mother, half-way houses in other districts, electronic monitoring, and anything else which might substitute for secured bond.

*Analysis*

Release on conditions is the general rule, and not the exception:

> The Bail Reform Act of 1984, 18 U.S.C. §§ 3141, et seq., requires the release of a person facing trial under the least restrictive condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of the community. 18 U.S.C. § 3142(c)(2); United States v. Motamedi, 767 F.2d 1403, 1405 (9th Cir.1985). Only in rare circumstances should release be denied, and doubts regarding the propriety of release should be resolved in the defendant's favor. Motamedi, 767 F.2d at 1405. On a motion for pretrial detention, the government bears the burden of showing by a preponderance of the evidence that the defendant poses a flight risk, and by clear and convincing evidence that the defendant poses a danger to the community. Id. at 1406-07.

U.S. v. Gebro, 948 F.2d 1118, 1121 (9th Cir. 1991).

However, within that general rule Congress has set forth certain crimes for which the accused is presumed to be a flight risk and danger to the community, and hence ineligible for

---

[2] Possibly, Jenson received an infraction citation for some activity in Georgia, but the particulars of this, if true at all, are unknown.

5

bail in the absence of countervailing evidence. All agreed that the charged offense set forth above is a presumptive offense for detention purposes. See 18 U.S.C. 3142 (e) referring to an offense listed in 2332b(g)(5)(B) of Title 18 which in turn references 18 U.S.C. 844(i), one of the object offenses of the conspiracy (§ 844n).[3] As a presumptive offense, in the absence of rebuttal evidence, the court shall presume "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." § 3142(e). The presumption is, of course, subject to rebuttal by the defendant, but the presumption remains as an evidentiary factor dependent upon all the facts and circumstances of a particular case and defendant. United States v. Jessup, 757 F.2d 378, 380-382 (1st Cir. 1985) (Breyer, J.)[4] The burden of proof remains with the government by clear and convincing evidence (danger to the community) and a preponderance (flight risk). Id. The specific factors set forth in § 3142(g) by Congress to be considered in addition to any presumption (which may be positive or negative for detention purposes) include the nature and circumstances of the offense, especially its violent aspects, the weight of the evidence (related by the Ninth Circuit to be the least important factor, see United States v. Windsor, 785 F.2d 755, 757(9th Cir. 1986)), details related to the person including: past conduct, criminal history, drug usage, ties to the community, whether the person was in court proceedings or on court imposed supervision when the crime was committed, and the nature and seriousness of the danger *to any person or the community that would be posed by the person's release*. (Emphasis added). The bail statute does not require a guarantee of safety to

---

[3] Although 18 U.S.C. § 844(n) is not itself listed within § 2332b(g)(5)(B), the terms of that section, which impose the same penalties as those specific sections which are the aim of the conspiracy, are sufficient to treat a conspiracy to commit a presumptive detention offense as commission of the listed offense itself. Any other interpretation would lead to the absurd result that simply because one was caught prior to the actual commission of a planned offense, that person would not be considered as dangerous as the person who by luck or lack of informant participation was able to complete the offense prior to his arrest. Such illogic is not compelled by a reading of the aforementioned statutes.

[4] Dicta in Jessup on an entirely different issue (standard of review) was abrogated in United States v. O'Brien, 895 F.2d 810 (1st Cir. 1990).

the community – only that conditions of release can "reasonably assure" the safety of the community or any person within it. § 3142(e), (g). Detention for alleged terroristic crimes is not *de jure* or *de facto* automatic, and courts must analyze each defendant's background and circumstances independently. See United States v. Al Arian, 280 F. Supp. 2d 1345 (M.D. Fla. 2003) determining that some defendants, allegedly belonging to the Palestinian Islamic Jihad, and in a case whose perspective encompassed multiple human killings, could be released.

While bail may not simply be set in a pre-determined amount which the court understands that a defendant cannot meet, § 3142(c)(2), the absence of substantial resources necessary to provide a deterrent effect may be considered in the bail equation, and may be significant in determining pretrial detention if a financial condition is a necessary component of reasonable assurance of non-flight and safety. United States v. Fidler, 419 F.3d 1026, 1028 (9th Cir. 2005).[5]

Finally, the Ninth, First, Second, Fifth, Seventh and Tenth Circuits have expressly approved a bond whose security for compliance with conditions may attach to *any* condition of

---

[5] Fidler explained: "If the district court orders that the defendant be released subject to conditions, the statute specifically prohibits the court from 'impos[ing] a financial condition that results in the pretrial detention of the [defendant].' 18 U.S.C. § 3142(c)(2). This provision was intended to prevent the practice of "de facto preventative detention," where a judge could in effect issue a detention order without a proper finding of risk of flight or danger to the community by granting bail but setting an exorbitant financial condition that the defendant could not meet. United States v. Westbrook, 780 F.2d 1185, 1187 n. 3 (5th Cir.1986). Several other circuits have addressed the apparent violation of § 3142(c)(2) that arises when, as in Fidler's case, a defendant is granted pretrial bail, but is unable to comply with a financial condition, resulting in his detention. It may appear that detention in such circumstances always contravenes the statute. We agree, however, with our sister circuits that have concluded that this is not so. See Westbrook, 780 F.2d at 1188-89; United States v. McConnell, 842 F.2d 105, 108-09 (5th Cir.1988); United States v. Szott, 768 F.2d 159, 160 (7th Cir.1985) (per curiam); United States v. Wong-Alvarez, 779 F.2d 583, 585 (11th Cir.1985) (per curiam); United States v. Jessup, 757 F.2d 378, 388-89 (1st Cir.1985), abrogated on other grounds by United States v. O'Brien, 895 F.2d 810 (1st Cir.1990). These cases establish that the de facto detention of a defendant under these circumstances does not violate § 3142(c)(2) if the record shows that the detention is not based solely on the defendant's inability to meet the financial condition, but rather on the district court's determination that the amount of the bond is necessary to reasonably assure the defendant's attendance at trial or the safety of the community. This is because, under those circumstances, the defendant's detention is 'not because he cannot raise the money, but because without the money, the risk of flight [or danger to others] is too great.' Jessup, 757 F.2d at 389."

pretrial release.  That is, the security for appearance may be forfeited upon any material breach of any condition of pretrial release.  See United States v. Gigante, 85 F.3d 83, 85(2nd Cir. 1996) citing, among other cases United States v. Vaccaro, 51 F.3d 189, 191-92 (9th Cir. 1995).

Turning to an application of the facts in this case to the law, the undersigned has determined that detention is appropriate in this case.

First, the court applies the presumption that Congress has required – that Jenson would be a danger to the community if released, and also a flight risk.  The government adds weight to that presumption by introducing evidence that Jenson was an active, not passive, participant in the alleged conspiracy.  His level of activity mirrors that of defendant Weiner.  Thus, the nature of the alleged crime, weighs against any type of release.

The government adds to its side of the ledger with consideration of the weight of the evidence.  Audio recordings of the defendant himself fully support the indictment/complaint allegations in this case, and essentially establish the case.  The court is not impressed at this juncture with hints that the defense may attempt an entrapment defense, as such would seem doubtful given the nature of the law of entrapment.[6]

---

[6] "'When entrapment is properly raised, the trier of fact must answer two related questions: First, did government agents induce the defendant to commit the crime? And, second, was the defendant predisposed? We discuss inducement at greater length below, see page 698 infra, but at bottom the government induces a crime when it creates a special incentive for the defendant to commit the crime. This incentive can consist of anything that materially alters the balance of risks and rewards bearing on defendant's decision whether to commit the offense, so as to increase the likelihood that he will engage in the particular criminal conduct. Even if the government induces the crime, however, defendant can still be convicted if the trier of fact determines that he was predisposed to commit the offense. Predisposition, which we also discuss at length below, see page 703 infra, is the defendant's willingness to commit the offense prior to being contacted by government agents, coupled with the wherewithal to do so. See United States v. Hollingsworth, 27 F.3d 1196, 1200 (7th Cir.1994) (en banc). While our cases treat inducement and predisposition as separate inquiries, see, e.g., United States v. McClelland, 72 F.3d 717, 722 (9th Cir.1995), the two are obviously related: If a defendant is predisposed to commit the offense, he will require little or no inducement to do so; conversely, if the government must work hard to induce a defendant to commit the offense, it is far less likely that he was predisposed. See Hollingsworth, 27 F.3d at 1200."
U.S. v. Poehlman, 217 F.3d 692, 697, 698 (9th Cir. 2000)

The history and characteristics of the person are mulifaceted criteria, and on balance are less mixed here than in Weiner's case, and favor the government's position. The government has produced solid evidence that Jenson intended to commit a very serious crime, and that he had planned to go underground afterwards, living a nomadic lifestyle. Jenson is much further removed from his family contacts than was Weiner. Jenson has no criminal record, and is fairly young at this point. He has not previously engaged in significant, violent activities. The lack of a criminal record is an important factor which all courts generally use to predict future dangerousness. Moreover, the government has not supplied proof, as requested by the court, that Jenson made or expressly accepted callous statements regarding "acceptance of human casualties" that have been attributed to co-defendant McDavid. But, the court finds that Jenson's lack of criminal record is overshadowed by his demonstrated intent to cause harm *and* lack of recent family community ties, i.e., his recent nomadic existence.

Given the total lack of suggested potential for secured bond, the court will not speculate what would occur should Jenson have proffered bond in an amount that would constitute for his sureties a "hurt" should he fail to appear or obey all release conditions. But see United States v. Koenig, 912 F.2d 1190, 1193 (9th Cir. 1999) ("His parents have offered to put up a bond, but there is reason to believe that his relationship with his parents is not a close one and that the bond would not assure his appearance"). The undersigned further finds that all of the suggestions of counsel about half-way houses, third party custody and electronic monitoring do not suffice to protect the community given the seriousness of the present allegations. Jenson may have been a novice in the area of explosives and their use, but he maintained an intent to wreak havoc on the community. It is easy to learn how to make and use explosives; the harder part is to acquire and maintain the callous intent to use them on innocent persons and their property. Jenson has demonstrated that he passed the latter test.

Moreover, with as little judgment as Jenson has demonstrated, the court believes that a significant financial deterrent is necessary in order to alleviate the risk that Jenson will

simply slide back into his underground. Without an impediment to make Jenson think twice about flight, an impediment which would hurt someone he cares for, he remains a flight risk.

*Conclusion*

The undersigned orders that Jenson be **detained** for the pendency of his case.[7]

DATED: 1/26/06

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

GGH:gh:035
jenson35.ord

---

[7] In fairness to Jenson, the undersigned has not relied on the ELF evidence presented at the Weiner hearing, although it is recounted above.