MARK J. REICHEL, State Bar #155034
THE LAW OFFICES OF MARK J. REICHEL
555 CAPITOL MALL, 6TH FLOOR, Suite 600
Sacramento, California  95814
Telephone: (916) 498-9258
FAX:       (916) 441-6553
mark@reichellaw.com
www.reichellaw.com

Attorney for Defendant
ERIC MCDAVID


IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.  CR.S-06-0035-MCE |
| Plaintiff, | ) | **DEFENDANT ERIC MCDAVID'S** |
| v. | ) | **SENTENCING MEMORANDUM** |
| | ) | Date: May 8, 2008 |
| ERIC MCDAVID, | ) | Time: 9:00 A.m. |
| | ) | Judge: Hon. Morrison C. |
| Defendant. | | England |

_____

**DEFENSE SENTENCING MEMORANDUM**

INTRODUCTION:

Following the denial of numerous pre trial motions
attacking the legality of the government's prosecution,
defendant Eric McDavid (hereinafter "Eric" )was tried and
convicted of the sole count in the indictment, a conspiracy
charge.  At trial, Eric's defense consisted of arguments
which included but were not limited to (a) he was entrapped,
and (b) there was no conspiracy between Eric and the co
defendants to do the acts charged in the indictment.  The

SENTENCING MEMORANDUM

main witness at trial for the government was an informant named "Anna" who required that she be allowed to testify under the name of "Anna" which was not her real name.  As well, the defense counsel recalls the government threatened the news media and the courtroom sketch artists that they would be held in contempt if they either showed her face on camera or drew her facial features through sketching, as "Anna"  was not to be shown publicly for fear of harm to her. A scene occurred in the courtroom during the trial when it was alleged a spectator had used a cell phone to capture a picture of Anna.  The episode turned out to be not founded. Strangely, in the May 2008 issue of *Elle* Magazine, with the feature article "True Believers,"  Anna is photographed on a full page story in living color, and is interviewed extensively for the story, providing background details of her life and re visiting the scenes with a magazine photographer.  *Elle* Magazine is available internationally, making "Anna" and her face an internationally recognized celebrity.

At the close of the case, a variety of McDavid's requested jury instructions, including that he did not have the wherewithal to commit the crime, that he was not predisposed when first approached by a government agent, and that he was entitled to an instruction on the lesser included crime of general federal conspiracy (to which the codefendants plead guilty), were denied by the court prior to

SENTENCING MEMORANDUM          2

1   instruction and final argument.  Juror questions for the

2   court, during deliberations, were on the issues of the

3   entrapment definitions and also what should be the "allowed"

4   time frame to consider evidence as relevant; these questions

5   were answered by the court with certain replies that were

6   over the defendant's objections. A new trial motion and

7   motion for judgement of acquittal was denied by the court.

8       McDavid hereby files the following sentencing

9   memorandum.

10      In attendance on the day of sentencing, hoping and

11  praying for a lenient sentence based on Eric's uniquely good

12  character, will be Eric McDavid's entire family who watched

13  every minute of the trial, as well as a large number of

14  friends and loved ones, many who also watched the trial daily

15  or who followed it daily from those who did attend.

16      Attached hereto as Exhibit "A" are a collection of

17  letters written for the court by Eric's family and friends;

18  Exhibit "B" are the Declarations by jurors in the case who

19  have extremely strong feelings--***mirroring those of his own***

20  ***family***- calling for a lenient and merciful sentence for Eric

21  McDavid. Defense counsel will provide the original

22  signed letters and Declarations at the time of sentencing.[1]

23

---

24      [1]  These exhibits should not be ignored; regardless of the frenzied nature of federal sentencing
since the inception of the guidelines, and through the sea change occasioned by the Court's recent
25  instructions on federal sentencing, (discussed hereinafter below) there are 2 immutable principles which
are presented by the case of this young man, Eric McDavid:  ***The good in a defendant's life can mitigate***
26  ***the bad***  and that ***mercy itself can warrant a sentence below the advisory guideline range***. U. S. v.
Adelson  441 F.Supp.2d 506  (SDNY 2006 ) (in securities fraud case, where guidelines call for ***life***
27  sentence, court imposes 42 month sentence in part because of the defendant's past integrity and good

28  SENTENCING MEMORANDUM          3

## THE LAW OF FEDERAL SENTENCING SINCE 1999

In a series of cases beginning in 1999, the Supreme Court examined the historical roots of the right to jury trial in both the original Constitution and the Bill of Rights.  See U.S. Const. Art. III, § 2, cl. 3, U.S. Const. Amend. 6.  The Court concluded that the right to jury trial is both an individual right and a structural allocation of power to the people, and held that, in order to give it meaningful content, *any fact that exposes a defendant to greater potential punishment must be found by a jury beyond a reasonable doubt*.  Jones v. United States, 526 U.S. 227 (1999); Apprendi v. New Jersey, 530 U.S. 466 (2000); Blakely v. Washington, 542 U.S. 296 (2004); United States v. Booker, 543 U.S. 220 (2005).  A majority of the Court in Booker applied this reasoning to hold that judicial "factfinding" under the mandatory United States Sentencing Guidelines

---

deeds. "But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.  This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant.");  See  Testimony Of Justice Anthony Kennedy before the Senate Judiciary Committee February 14, 2007 in response to Senator Whitehouse ("Our sentences are too long, our sentences are too severe, our sentences are too harsh... [and because there are so few pardons] there is no compassion in the system. There's no mercy in the system."), video link accessible at Professor Berman's Sentencing Law and Policy Blog of Feb. 15, 2007); Justice Kennedy 's ABA speech of 2003 ("A country which is secure in its institutions, confident in its laws should not be ashamed of the concept of mercy. As the greatest of poets has said 'mercy is the mightiest in the mightiest. It becomes the throned monarch better than his crown.'");  James Q. Whitman, Harsh Justice  (Oxford Press 2003) paperback ed. at 223 n. 72 ("the makers of sentencing guidelines succeeded only in contributing to the making of a law of punishment that shows obstinately little concern for the personhood of offenders...a law that tends to treat offenders as something closer to animals than humans, and that has correspondingly sought, more and more frequently, simply to lock them away"); id at page 19 ("American punishment is comparatively harsh, comparatively degrading, comparatively slow to show mercy")

SENTENCING MEMORANDUM          4

*violated* the Sixth Amendment.  A different majority (with Justice Ginsburg in both) created a remedy, directing judges to impose a sentence that complies with 18 U.S.C. § 3553(a) and to treat the guidelines as *merely advisory* within that statutory framework.

In its most recent cases, <u>Rita v. United States</u>, 127 S. Ct. 2456 (2007), <u>Kimbrough v. United States</u>, 128 S. Ct. 558 (2007) and <u>Gall v. United States</u>, 128 S. Ct. 586 (2007), and also in <u>Cunningham v. California</u>, 127 S. Ct. 856 (2007), the Court gave substantive and procedural content to the remedy, making clear that *Section 3553(a) is the controlling sentencing law* and rejecting the devices that were used after <u>Booker</u> to maintain a "de facto" mandatory guideline system.

*To re iterate, Section 3553(a) is the controlling sentencing law as taught by the Supreme Court*.  Expressly, the USSG Guidelines are limited to one of several factors. "Guidelines are only one of the factors to consider when imposing sentence." <u>Gall</u>, 128 S. Ct. at 602.  The Guidelines, "formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence." <u>Kimbrough</u>, 128 S. Ct. at 564. Speaking of 3553, the Court instructs us that "The statute, as modified by <u>Booker</u>, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to achieve the goals of sentencing." <u>Kimbrough</u>, at 570.  The result is that there can

SENTENCING MEMORANDUM          5

be no more "mindless uniformity". In <u>Gall</u> and <u>Kimbrough</u>, the Court directly rejected mindless uniformity because it cannot co-exist with the <u>Booker</u> remedy:  "These measures will not eliminate variations between district courts, but our opinion in <u>Booker</u> recognized that some departures from uniformity were a necessary cost of the remedy we adopted." <u>Id</u>. at 574.

As well, in <u>Gall</u>, the Court not only used the terms "departure" and "variance" interchangeably, <u>Gall</u>, 128 S. Ct. at 594, 597, but made no mention whatsoever of the "heartland" concept or the guidelines' restrictions on consideration of individual characteristics.  This was so even though the case was all about a below-guideline sentence based on offender characteristics that the guidelines ignore or deem "not ordinarily relevant," including age and immaturity, voluntary withdrawal from the conspiracy, and self rehabilitation through education, employment, and discontinuing the use of drugs. <u>Id</u>. at 598-602.  This strongly instructs that the "heartland" concept and the guidelines' restrictive policy statements are no longer relevant. Indeed, Section 3553(a)(1) requires the sentencing court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant" in every case, and the statute trumps any guideline or policy statement to the contrary.  See <u>Stinson v. United States</u>, 508 U.S. 36, 38, 44, 45 (1993); <u>United States v. LaBonte</u>, 520 U.S. 751, 757 (1997).  It is no longer permissible, in

SENTENCING MEMORANDUM            6

evaluating a non-guideline sentence, to use percentages or proportional mathematical calculations based on the distance "from" the guideline range, or to require "extraordinary" circumstances.  <u>Gall</u>, 128 S. Ct. 594, 595.

**THE APPROPRIATE SENTENCE IN THIS CASE: A MAXIMUM 5 YEARS PRISON.**

Such a sentence of 5 years incarceration maximum is a sentence that is sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of subsection 3553 and is in accord with similarly situated defendants.

1. -<u>The nature and circumstances of the offense</u>.  The defendant, along with 2 other co defendants, has been found guilty of conspiracy to damage or destroy government property by means of fire or explosives. The defense version of the evidence is that in the best circumstances for the government the evidence shows that the 3 co defendants conspired to attempt to make an explosive device and were not successful.

   -<u>The characteristics of the defendant</u>

The attached letters on behalf of the defendant bear the most excellent witness to the character of this young man and speak quite loudly.  As well as the undisputed testimony of his character witnesses at the trial, Eric McDavid is shown as follows:

Eric had never before been involved in any criminal behavior; he is a kind and gentle soul, blessed with many

SENTENCING MEMORANDUM          7

friends.  He is truly loved by his family and many, many other members of his community. He spent his youth without any trouble, he was an excellent and well adjusted member of his family, in a very traditional and well adjusted family. He never hesitates to help others and is extremely intelligent. He cares for everyone he knows very deeply.

2. <u>The need for the sentence imposed</u>

 The sentence suggested by the defendant will reflect the seriousness of the offense, will promote respect for the law, will  provide just punishment for the offense, will afford adequate deterrence to criminal conduct, and will to protect the public from further crimes of the defendant. Indeed, but for the action of the FBI and the informant in the case, there is no evidence McDavid would ever have committed any crimes at all.

Other similarly situated defendants have received just this type of sentence as requested by the defense, and indeed, their crimes have been greater:.

<u>United States v. Ryan Lewis</u>, CR-S-05-083 EJG Eastern District CA 2007 (6 year sentence, setting serious fires to 3 separate facilities and spray painting "ELF" on the facilities; sending "ELF communiques to authorities about the crimes; there was no informant present before the crime nor any "pushing" or assistance or "sting" set up by the government.)

SENTENCING MEMORANDUM            8

1   The Portland "Family Case." [2] The 65 count indictment,

2   _____

3   [2] The following Press Release was issued by the United States Attorney's Office District Of

4   Oregon at http://portland.fbi.gov/dojpressrel/2006/alfelf.htm

5   Animal Liberation Front (ALF) and Earth Liberation Front (ELF) Members Indicted by Federal Grand

6   Jury on Conspiracy and Arson Charges

7   PORTLAND, OREGON - United States Attorney Karin J. Immergut announced today that a grand
jury in Eugene, Oregon, has returned a 65-count indictment charging eleven (11) defendants with

8   conspiracy and related offenses covering arsons and attempted arsons that occurred from l996 through
200l in Oregon and four other Western states. The indictment alleges that the defendants, who called

9   themselves "The Family", acted as a cell of groups commonly referred to as the Earth Liberation Front
(ELF) and the Animal Liberation Front (ALF). This case was jointly investigated by the FBI, ATF, Eugene

10  Police Department, Bureau of Land Management, U.S. Forest Service, Oregon State Police, and Lane
County Sheriff's Office.

11

12  According to the indictment, by their actions the defendants sought to influence and affect the conduct of
government, private business, and the civilian population through force, violence, sabotage, mass
destruction, intimidation and coercion, and to retaliate against government and private businesses by

13  similar means.

14  "I want to praise the hard work of all participating law enforcement agencies in this case. Because of their
relentless efforts to solve these cases, after nine years, we are finally able to begin the process of holding

15  the appropriate environmental extremists responsible," stated U.S. Attorney Karin Immergut.

16  Arsons and related crimes included in the conspiracy charges are:

17  (1) October 28, 1996 - arson and attempted arson at the U.S. Forest Service's Detroit Ranger Station in
Detroit, Oregon;

18  (2) October 30, 1996 - arson at the U.S. Forest Service's Oakridge Ranger Station near Oakridge, Oregon;
(3) July 21, 1997 - arson at Cavel West, Inc. in Redmond, Oregon;

19  (4) November 30, 1997 - arson at the Bureau of Land Management Wild Horse and Burro Facility near
Burns, Oregon;

20  (5) June 21, 1998 - arson at the National Wildlife Research Facility in Olympia, Washington;
(6) October 11, 1998 - attempted arson at the Bureau of Land Management Wild Horse Holding Facility

21  near Rock Springs, Wyoming;
(7) October 19, 1998 - arson at the Vail Ski Facility in Eagle County, Colorado;

22  (8) December 22 and 27, 1998 - arson and attempted arson at U.S. Forest Industries, Medford, Oregon;
(9) May 9, 1999 - arson at Childers Meat Company, Eugene, Oregon;

23  (l0) December 25, 1999 - arson at the office of the Boise Cascade Company in Monmouth, Oregon;
(11) December 30, 1999 - destruction of an energy facility high-voltage tower near Bend, Oregon;

24  (12) September 6, 2000 - arson at the Eugene, Oregon, Police Department West University Public Safety
Station;

25  (13) January 2, 2001 - arson at Superior Lumber Company, Glendale, Oregon;
(14) March 30, 2001 - arson and destruction of 35 trucks and SUVs at Joe Romania Chevrolet Truck

26  Center, Eugene, Oregon;
(15) May 21, 2001 - arson and attempted arson at the Jefferson Poplar Farm, Clatskanie, Oregon;

27  (16) May 21, 2001 - arson at the University of Washington Horticulture Center, Seattle, Washington;
(17) October 15, 2001 - arson at the Bureau of Land Management Wild Horse Facility, Litchfield,

28  SENTENCING MEMORANDUM            9

charging 11 defendants with these acts, an indictment
covering *83 pages* in <u>United States v. Dibee, Gerlach, Harvey,</u>
<u>McGowan, Meyerhoff, Overaker, Paul, Rubin, Savoi, Thurston,</u>
<u>Tubbs</u>, CR-06-60011 AA, District of Oregon, concerned *actual*
*horrific arson's*, coordinated and sophisticated, resulting in
millions of dollars worth of actual damage. There was not an
informant present in the group, no actual assistance by law
enforcement for the "Family," no resources provided by law
enforcement, and there are certainly not juror affidavits
after the convictions submitted finding a close case of
entrapment, embarrassment with the F.B.I., and the belief
that the defendants should get any reduced sentence.

The relevant defendants in the cases received the
following sentences (none of the sentences listed here
concern those who cooperated with the government-many
cooperated):

---

California.

Six of the defendants charged in the conspiracy were charged in other federal indictments in the last two months covering Oregon arsons and destruction of an energy facility: Chelsea Dawn Gerlach, age 28; Sarah Kendall Harvey, age 28; Daniel Gerard McGowan, age 31; Stanislas Gregory Meyerhoff, age 28; Josephine Sunshine Overaker, age 31; and Kevin Tubbs, age 36.

Additional defendants in the new conspiracy indictment are: Joseph Dibee, age 38; Jonathan Mark Christopher Paul, age 39; Rebecca Rubin, age 32; Suzanne Savoie, age 28; and Darren Todd Thurston, age 34. Eight defendants were arrested prior to indictment, and Dibee, Overaker and Rubin are believed to be outside the United States.

The indictment states that the group committed arsons with improvised incendiary devices made from milk jugs, petroleum products and homemade timers in a series of attacks in the five states. The targets of these attacks included U.S. Forest Service ranger stations, Bureau of Land Management wild horse facilities, meat processing companies, lumber companies, a high-tension power line, and a ski facility in Colorado. The indictment alleges that the group claimed to be acting on behalf of ALF and ELF.

SENTENCING MEMORANDUM                    10

1   <u>United States v. Nathan Block</u>: 7 years 8 months

2   <u>United States v. McGowan</u>:     7 years

3   <u>United States v. Paul</u>:        4 years.

4   3. <u>Providing the defendant with needed medical care in</u>

5        <u>the most effective manner.</u>

6   As the court will recall, while in jail awaiting trial,

7   Eric contracted a serious and chronic heart condition which

8   he will have for life, likely as a result of a bacteria in

9   the outer heart muscle, Acute pericarditis (inflammation of

10  the sac of the heart). This may be caused from a variety of

11  conditions ranging from a bacterial infection, viral

12  infection, myocardial infarction, (heart attack), idiopathic

13  (unknown) and other more rare causes.  In about 20% of cases,

14  inflammation involves the heart muscle and may cause heart

15  muscle damage. The other more common and potentially fatal

16  complication of acute pericarditis is accumulation of fluid

17  around the heart restricting the heart's ability to pump.

18  This potentially fatal condition, also known as pericardial

19  tamponade, requires removal of the fluid generally on an

20  emergency basis and, if untreated, is typically fatal.

21  Eric, at age 30, has had several recurrences of the

22  condition while at the jail. Generally, prison and jail

23  environments are not normally the appropriate place for

24  recovery from such a condition.  Existing outside the prison

25  would be a much better medical course, undeniably.

26  When he gets the symptoms, he becomes very pale, very

27  weak, and is hardly able to walk.  He has difficulty sitting

28  SENTENCING MEMORANDUM          11

and is in obvious pain whenever he moves. He has shortness of breath, fatigue, and it feels like a "rock" is lodged underneath his sternum. When lying down, he feels great pressure in his upper body, and his heart rate seems to increase rapidly.  He is unable to lie flat.

This condition will make his incarceration time much more onerous and physically painful than it is for other inmates who are healthy. His medical needs, the effect it will have upon his term of imprisonment, and the ability of the Bureau of Prisons to effectively deal with the condition are all factors the court must consider at this sentencing. Notably, this is simply a condition which incarceration *itself* creates a high risk of serious health effects-simply by being in an institution.[3]

_____

[3] Authorities to guide the court in this instance are as follows: <u>Booker</u> itself at 125 S.Ct. at 765.); <u>U.S. v. Hein</u> 463 F.Supp.2d 940 (E.D. Wisc.  2006) (where defendant convicted of being felon in possession of ammunition, the guideline term of 12-18 is "greater than necessary to satisfy the purposes of sentencing" in part because "defendant was in extremely poor health, as evidenced by the medical and vocational records and his receipt of social security and]  a prison term for one in his condition would be extremely difficult, and that the Bureau of Prisons would be strained in dealing with him"); <u>U.S. v. Wadena</u> 470 F.3d 735 (8th Cir. 2006) (where 67 year old defendant convicted of mail fraud and guidelines 18-24 months, proper for district court to impose below guideline sentence of  probation, in part, because  client suffered from "chronic health conditions, including hypertension, hearing loss, and cataracts [and] Type II diabetes and kidney disease, which recently worsened to the point where he requires three-hour dialysis treatment three times a week" and  "The 2005 Guidelines, which the district court applied in this case, state that courts may consider departing downward to a non-prison sentence for an "infirm" defendant because "home confinement might be equally efficient as and less costly than incarceration." USSG § 5H1.1 (2005).")  The district court properly found that

SENTENCING MEMORANDUM            12

probation was "sufficient but not greater than necessary to impress upon [Wadena] the seriousness of the offense." The sentence  promotes respect for the law, provides just punishment for the offense, and affords adequate deterrence as well as providing Wadena "with needed medical care." "the overarching policy contained in [5H1.1 is clear: in some situations, a district court may impose a non-prison sentence when a defendant has serious medical needs").

   U.S. v. Spigner  416 F.3d 708, *712 (C.A.8  2005) (where defendant convicted of sales of more than 50 grams of crack, base level 34, and where defense agreed not to ask for downward departures on basis of health, 5H1.4, case remanded because district court can still impose a sentence lower than the suggested because after Booker the  new advisory sentencing scheme permits broader considerations of sentencing implications. Moreover, section 3553(a) **requires** that a district court consider the need to provide medical care in the most effective manner when sentencing a defendant. "Although he was only thirty-three years old defendant suffered from high blood pressure so severe it resulted in the failure of his kidneys. He was on a daily prescription regimen requiring two drugs to control his blood pressure and a third for his kidney ailment. His condition demanded regular dialysis treatment, and he has been subject to surgeries for the insertions of two different catheters for dialysis. At the time of sentencing, Spigner was on a waiting list for a kidney transplant, but presumably must continue his dialysis indefinitely unless a donor is found."

   This departure is available even *in sex with minor cases and child porn cases*.  USSG § 5K2.22 (effective April 30, 2003). 5H1.4 provides that "an extraordinary physical impairment may be a reason to impose a sentence below the guideline range; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment." See  U.S. v. Martin,  363 F.3d 25, 50 (1st Cir. 2004) (in tax fraud case, three level downward departure proper (and possibly more on remand) where "several serious medical conditions make Martin's health exceptionally fragile [and] ...we are not convinced that the BOP can adequately provide for Martin's medical needs during an extended prison term [and] There is a high probability that lengthy incarceration will shorten Martin's life span); See  U.S.  v. Gee, 226 F.3d 885 (7th Cir. 2000) (downward departure under §5H1.4 based on health not abuse of discretion where judge concluded that "imprisonment posed a substantial risk to [defendant's] life,"  BOP letter stating that it could take care of any medical problem "was **merely a form letter trumpeting [BOP] capability**"); U.S.  v. Streat, 22 F.3d 109, 112-13 (6th Cir. 1994) (remanded to district

SENTENCING MEMORANDUM            13

1

2        4.   The **Advisory** Sentencing Guidelines

3        The defendant objects to certain advisory calculations

4   in the Advisory Pre Sentence Report, (hereinafter "report")as

5   follows.

6        *Offense Level Computations*: Page 9, paragraph 31.

7   Base Offense Level. Mr. McDavid should not be at level 24.

8   The report  correctly notes that the jury convicted the

9   defendant of Conspiracy to Damage or Destroy by Fire Or

10  Explosive.  It also correctly notes that the USSG require the

11  levels be assessed under 2X1.1(a), as a conspiracy.  The

12  report is also correct in that "reasonable certainty" must be

13  established for any intended conduct before it can be an

14  adjustment.  It is in fact very clear that there is not

15  "reasonable certainty" for the intended conduct used in the

16  report to establish the level 24.  The evidence actually puts

17  this at level 9, as follows. Specifically, the "certainty"

18  here is that the jury found this defendant guilty of a

19  conspiracy to commit arson, and that alone.  There is no

20  evidence the jury found an intended target to be something of

21  a government building, something of a public use, or that the

22

23  _____

24  court observing that court has discretion to depart because
    of defendant's "extraordinary physical impairment"); <u>U.S.   v.</u>

25  <u>Long</u>, 977 F.2d 1264, 1277-78 (8th Cir. 1992) (D's extreme
    vulnerability to victimization in prison justifies downward

26  departure where four doctors said so).

27

28  SENTENCING MEMORANDUM          14

group "knowingly" created a substantial risk of death or
serious bodily injury.  No evidence whatsoever, especially
with the defense submitted Declarations of juror Carol Runge
and Diane Bennett.  With this evidence from the jurors, both
2K1.4 (a) (1) and (a) (2) do not apply.  2K1.4(b)(1)
establishes a base level of 2 plus the offense level from
2b1.1, which starts at 7.  McDavid's correct base level
should be a 9.[4]

The testimony at trial from the government
witnesses-codefendants Zach Jenson and Lauren Weiner--was
that the defendant did not conspire to commit arson against
the targets listed in the indictment; the court also then
instructed the jury that the defendant could be convicted if
he generally conspired to commit arson by fire or an
explosive, and that they did not have to find that he
conspired to commit arson against any of the targets in the
indictment; the government then argued this exact point in
closing argument to the jury; finally, the jurors themselves,
in post verdict interviews, in the presence of FBI Agent

---

[4] Indeed, these juror declarations have been recently made almost legally vital–in the absence of special verdict forms-- by our Supreme Court's instruction.  Specifically, the timing of Cunningham v. California, -- U.S. --, 127 S. Ct. 856, 166 L. Ed. 2d 856 (2007), after the internally irreconcilable Booker decisions, republishes the Apprendi/Blakely/"Constitutional" Booker theme over "Remedial" Booker's minimization of the Sixth Amendment. Thus, the epicenter of Sixth Amendment jurisprudence for sentencing purposes is located on the facts found by a jury beyond a reasonable doubt.  The analysis in Cunningham reiterates and clarifies that the statutory maximum for Sixth Amendment analysis must be determined, in first instance, by jury-found facts.  In Cunningham  Justice Ginsburg, while speaking for a six justice majority of our United States Supreme Court, issued this ringing reminder: "This Court has repeatedly held that, under the Sixth Amendment, any fact that exposes a defendant to a greater potential sentence must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely a preponderance of the evidence. Id. at 864. 15

SENTENCING MEMORANDUM          15

Nasson Walker, acknowledged that they did not make a finding that the defendant McDavid conspired with the others to destroy government facilities.  The defense has submitted juror declarations which are to be used for, among other things, this exact issue for sentencing, Exhibit "B."

Significantly, the Ninth Circuit's established rule, requiring the government to bear the burden of proof for facts found in support of Guidelines enhancements that turn out to have a disproportionate impact on the ultimate sentence imposed to be *established by clear and convincing evidence*, continues to govern sentencing decisions to this date.  United States v. Staten, 466 F.3d 708, 720 (9th Cir. 2006); disproportionate effect, the government bore the burden of proving the underlying factual findings by clear and convincing evidence. United States v. Pike, 473 F.3d 1053, 1057 (9th Cir. 2007). Also see United States v. Dare, 425 F.3d 634, 642 (9th Cir. 2005) (listing factors appropriate for consideration in determining whether effect is disproportionate).

The correct Base Offense Level is a level 9. The difference is **clearly disproportionate**, from a 9 to a 24.

*Victim Related Adjustment*, Page 10, paragraph 33: domestic terrorism. Again, enhancements that turn out to have a disproportionate impact on the ultimate sentence imposed to be established by clear and convincing evidence, continues to govern sentencing decisions.  United States v. Staten, 466 F.3d 708, 720 (9th Cir. 2006).  This adjustment, obviously,

SENTENCING MEMORANDUM                16

has more than simply a disproportionate impact on
sentencing—it takes the defendant to a Category VI **from a
Category I** and adds 12 levels.

The support in the report for the enhancement is
"because the defendant's intention was to intimidate
government conduct to support his political beliefs."
However, there is no evidence that this issue—this important
issue—was determined true by the jury nor that "clear and
convincing evidence" is in the record that the crime was to
influence government conduct. None whatsoever.  The
enhancement is not applicable. The juror declarations address
this issue as well, and defeat such an argument.

\*\*_Variance/Departure_. The following are factors which
warrant a reduction in the final adjusted offense level under
the advisory guidelines calculations as either a variance or
departure.

Departure/reduction for imperfect entrapment. While the
jury did convict the defendant, the majority of jurors felt
that this was a strong case of entrapment. See attached
Declarations of jurors Diane Bennett and Carol Runge.
McDavid is entitled to a reduction.[5]

Disparity with similarly situated codefendants. The two
codefendants, of exact same culpability, will receive

---

[5]  The following authorities instruct:  Even though the defendant was not entrapped in a legal
sense, court appropriately departed downward under §5K2.12 where trial court was troubled by
"aggressive encouragement of wrongdoing [by informer]," "prosecutorial misconduct and vindictive
prosecution." U.S. v. Garza-Juarez, 992 F.2d 896, 910-912 & n. 2 (9th Cir. 1993); see U.S. v.
McClelland, 72 F.3d 717 (9th Cir. 1995) (district court properly departs downward 6 levels for imperfect
entrapment under §5K2.12 even though defendant initiated plan).

SENTENCING MEMORANDUM          17

1   sentences of no more than 5 years, which flies directly in

2   the face of the Guidelines' expressed purpose of encouraging

3   uniformity in sentencing.

4   There can be no dispute that they are all equally

5   culpable.  The difference is that the government sought

6   agreements with these 2 codefendants to testify against the

7   defendant and they took that offer.  Their testimony at trial

8   was that they were all equally culpable and that none of the

9   3 was "the leader." Additionally, as set forth above, *supra*,

10   other defendants involved in similar crimes which resulted in

11   actual extensive damage received lesser sentences than sought

12   by the Report in this case.[6]

13   <u>Sentencing entrapment</u>.  The testimony and evidence at

14

15   [6] See discussion from **U.S. v. Wills**  476 F.3d 103 (2nd Cir. 2007) (although district court

16   improperly considered certain factors and sentence vacated, "we do not, as a general matter, object to
    district courts' consideration of similarities and differences among co-defendants when imposing a

17   sentence") **U.S. v. Krutsinger**  449 F.3d 827 (8th Cir. 2006) (C.A.8 ,2006) (where defendant convicted of

18   obstruction of justice regarding drug conspiracy and where government sought 60 months based on
    cooperation, judge properly imposed below guideline sentence of 20 months because of disparity with

19   other defendants. "We cannot say the district court abused its discretion in fashioning a sentence that
    attempted to address the disparity in sentences between two nearly identically situated individuals who

20   committed the same crime in the same conspiracy"); **U.S. v. Walker** , 439 F.3d 890, 893 (8th Cir. 2006)

21   (in imposing sentence district court properly considered the sentenced imposed on the defendant's sister
    because  § 3553(a)(6) mandates that a district court consider the "need to avoid unwarranted sentence

22   disparities among defendants with similar records who have been found guilty of similar conduct." );

23   <u>Cullen</u> v. <u>U.S.</u> , 194 F.3d 401, 408 (2d Cir. 1999). <u>U.S.  v. Daas</u>, 198 F.3d 1167 (9th Cir. 1999) (defendant
    argued for departure based on disparity between his sentence and that of co-defendants who cooperated,

24   but district judge said not legal ground. Reversed. "Downward departure to equalize sentencing disparity

25   is a proper ground for departure under the appropriate circumstances . . . Indeed, a central goal of the
    Sentencing Guidelines is to eliminate sentencing disparity . . . Here, the record indicates that the district

26   court believed incorrectly that it lacked the authority to depart downward based on sentencing disparity.

27   Because the district court actually had this authority but mistakenly failed to exercise it to determine
    whether the facts here warranted departure, this court remands for findings as to whether a downward
    departure is appropriate.");

28   SENTENCING MEMORANDUM          18

trial established that in fact it was the informant who
"pushed" on the targets of a government facility, the Nimbus
Dam and/or the Institute of Forensic Genetics. She, Anna
"pushed" the plans forward. Undisputably. Without her
"pushing" then the case might very well have been exactly as
Ryan Lewis, involving only *commercial targets*; as well, it
very well would have been simple vandalism, something
extensively discussed by the defendants in the case.[7]

   Isolation in prison based upon his high notoriety. Mr.
McDavid will always be considered "high risk" for being
assaulted while in prison. His crimes ate of extremely high

---

[7]See U.S.S.G. § 2D1.1, comment. (nn.12, 15); U.S. v. Searcy, 233 F.3d 1096, 1099 (8th Cir. 2000) (remands to see if defendant was entrapped for sentencing purposes– "Application Note 12 states, in relevant part: 'If, however, the defendant establishes that he or she did not intend to provide, or was not reasonably capable of providing, the agreed upon quantity of the controlled substance, the court shall exclude from the offense level determination the amount of controlled substance that the defendant establishes  that he or she did not intend to provide or was not reasonably capable of providing.'"-"the Sentencing Guidelines focus the sentencing entrapment analysis on the defendant's predisposition"); Also see U.S. v. Searcy, 233 F.3d 1096, 1099 (8th Cir.2000) (sentencing entrapment viable ground for downward departure-"This case demonstrates that the Sentencing Guidelines have a "terrifying capacity for escalation of a defendant's sentence" as a result of government misconduct"); U.S. v. Montoya, 62 F.3d 1, 3 4 (1st Cir.1995) (same);  U.S. v. Castaneda, 94 F.3d 592 (9th Cir. 1996) (district court erred in not considering whether to reduce amount of drugs attributed to defendant because he was entrapped); U.S. v. Staufer, 38 F.3d 1103 (9th Cir. 1994) (district court has authority to depart downward where defendant was encouraged by agents to furnish 10,000 doses of LSD, more drugs than defendant was predisposed to deliver (5,000 doses)); U.S. v. Naranjo, 52 F.3d 245, 25-51 (9th Cir. 1995) (where evidence indicated defendant agreed to buy cocaine only after months of persistent pressure by informant and where defendant could afford to buy and preferred to buy only one kilogram but finally agreed to by the five only after agent offered to front the four of the five and said he would buy back three, case remanded with instructions to provide specific factual findings to support district court's ruling that defendant did not prove sentencing entrapment); see U.S. v. Parrilla, 114 F.3d 124, 12 carrying 7-128 (9th Cir. 1997) (if defendant proves he was entrapped into carrying gun, downward departure warranted); U.S. v. Ramirez-Rangel, 103 F.3d 1501 (9th Cir. 1997) (defendant entrapped into receiving machine guns 30-year sentence when guns delivered to him in bag and where he spoke no English); District Court: U.S. v. Panduro, 152 F.Supp.2d 398 (S.D.N.Y. 2001) (in reverse sting operation, defendant granted three-level downward departure under App. Note 15 "to adjust for the artificially low price of the [35 kilos] of cocaine resulting from the overly generous credit terms [proposed by the government] - "if [the agent] had not extended credit for half the purchase price...defendants [would have only purchased half the amount" the extension of credit was "unreasonable and below market"); U.S. v. Martinez-Villegas, 993 F.Supp. 766 (C.D.Cal. 1998) (where defendant who normally delivered 5-10 kilogram quantities was induced to deliver 92 kilogram quantities, departure warranted.)

SENTENCING MEMORANDUM            19

1   notoriety, and are considered "domestic terrorism" by the
2   Justice Department. He is subject to assault by all other
3   inmates because of the notoriety-such inmates are "targets"
4   for other inmates-and he is also of high risk because he is
5   considered "anti American." He has spent every single day of
6   his pretrial detention in the highest security, in total
7   separation from all other inmates, at the Sacramento County
8   Jail for just these reasons. He has been isolated for over 2
9   years there.

10      As such, he will serve his entire term in isolation,
11   suffering sensory deprivation.  This amounts to physical and
12   psychological punishment in excess of all other inmates. A
13   departure is therefore **very** warranted based upon his pretrial
14   punishment he has suffered in isolation and what he will
15   still suffer in the years to come.[8]      <u>Health issues of</u>

16   _____

17      [8] The harshness of the pretrial confinement–which no one can dispute Eric McDavid has suffered-
     will result on it's own in a reduced sentence: <u>U.S. v. Pressley</u>, 345 F.3d 1205 (11th Cir. 2003) (where
18   defendant spent six years in presentence confinement, of which five years were in 23-hour a day lockdown
     and where he had not been outside in five years, district court erred in holding that departure not
19   available); <u>U.S. v. Carty</u>, 263 F.3d 191 (2nd Cir. 2001) (defendant's pre sentence confinement in
     Dominican Republic where conditions  were bad may  be a permissible basis for downward departures
20   from sentencing guidelines). <u>U.S. v. Mateo</u>, 299 F.Supp.2d 201 (S.D.N.Y. 2004) (Presentence  sexual
     abuse by prison guard and lack of proper medical attention for over 15 hours while defendant was in labor
21   warranted downward departure in sentence for conspiring to distribute heroin); <u>U.S. v. Rodriguez</u>, 214
     F.Supp. 2d 1239 (M.D. Ala. 2002) (two level downward departure in addition to other departures in drug
22   case under 5K2.0 because defendant raped by prison guard pending sentence-- "A rape in prison, by a
     prison guard, while awaiting sentencing on this case, is obviously a highly unusual situation....to fail to
23   take this rape into account in Rodriguez's sentence would mete out a disproportionate punishment to her,
     thus thwarting the Sentencing Guidelines' express goal of equalizing sentences."); <u>U.S. v. Francis</u>, 129
24   F.Supp.2d 612, 616 (S.D.N.Y. 2001) (in illegal reentry case, court departs downward one level because d's
     13 month pretrial confinement in county facility (HCCC)  where defendant was subjected to extraordinary
25   stress and fear, parts of the facility were virtually controlled by gangs and inmates, defendant was the
     victim of an attempted attack and threats, suffered significant weight loss, stress, insomnia, depression,
26   and fear as a result, and HCCC was operating at 150% capacity . . . --qualitatively different conditions than
     those of pre sentence detainees in federal facilities operated by the Bureau of Prisons.);  <u>U.S. v. Bakeas</u>,
27   987 F.Supp. 44, 50 (D. Mass. 1997) ( "[A] downward departure is called for when, as here, an unusual
     factor makes the conditions of confinement contemplated by the guidelines either impossible to impose or
28   SENTENCING MEMORANDUM          20

McDavid.  Mr. McDavid, as the Court is aware, developed a serious heart infection in the county jail.  He will have this for life.  His prison term will be substantially more onerous than other inmates. See discussion, *supra*.

Overstated criminal history. A Level VI clearly overstates his criminal history and likelihood of recidivism. This young man has never before been in custody, let alone in trouble with the law. See U.S. v. Collington, 461 F.3d 805 (6th Cir. 2006) (in drugs and gun case where guidelines 188 -235, sentence of 120 months affirmed in part because "the district court found that, despite Collington's criminal history being at a IV, Collington has never been in custody for any substantial period of time," having only been imprisoned for seven months before this crime.").

---

inappropriate.").

A perfect example of a reduction based upon the grounds that prison life will be tougher than it is for other inmates is U.S. v. Noriega, 40 F.Supp.2d 1378 (S.D.Fla. 1999) (judge reduces old-law sentence from 40 to 30 years in part because of harsh nature of incarceration - "There is little question that [segregated confinement] is a more difficult  type of confinement than in general population. For some, the consequences of such deprivation can be serious."); see McClary v. Kelly, 4 F.Supp.2d 195, 207 (W.D.N.Y. 1998) ("a conclusion however, that prolonged isolation from social and environmental stimulation increases the risk of developing mental illness ***does not strike this court as rocket science***. Social science and clinical literature have consistently reported that when human beings are subjected to social isolation and reduced environmental stimulation, they may deteriorate mentally and in some cases develop psychiatric disturbances (citing cases)."  See also, "The Eighth Amendment and Psychological Implications of Solitary Confinement," 21 Law and Psychology Review, Spring 1997, p. 271; "Solitary Confinement, Legal and Psychological Considerations," 15 New England Journal on Criminal and Civil Confinement, 301, Summer 1989.

See also Koon v. U.S., 518 U.S. 81 (1996) (no abuse of discretion to grant downward departure to police officers convicted of civil rights violation because of vulnerability in prison); U.S. v. LaVallee 439 F.3d 670  (10th Cir. 2006) ( District court did not abuse its discretion when it gave defendants who were former prison guards a two-level downward departure based on their susceptibility to abuse in prison after they were convicted of conspiring to deprive inmates of their constitutional rights; court found that case was outside the heartland of the Guidelines because it was part of an investigation that was reported on in a publication distributed among federal inmates and that the defendants were threatened after they were incarcerated)

SENTENCING MEMORANDUM              21

1    Even though the Category VI is achieved because of the

2    Domestic Terrorism Enhancement, the Court can reduce the

3    Criminal History on the defendant's urging where facts make

4    the request reasonable, as they do in the instant case.

5    There are cases where this is held in Career Offender cases,

6    where the "jump" to a Category VI is found to overstate the

7    risk of recidivism per the Sentencing Commission. See <u>U.S. v.</u>

8    <u>Fernandez</u> 436 F.Supp.2d 983 (E.D. Wisc.  2006)(where

9    defendant was career offender with,  guideline range of

10   188-235 months is "greater than necessary" to satisfy

11   purposes of sentencing, court imposes 126 months in part

12   because of Sentencing Commission study on unfairness of

13   career offender designation).[9]

14

_____

15       [9] There are a variety of cases so holding.  <u>U.S. v. Ennis</u> 468 F.Supp.2d 228 (D. Mass.  2006)
     (where each of three defendants convicted of drug distribution, significant downward departures granted to
16   each because  the "astonishing" sentences that would result from "the career offender guidelines as applied
     to the cases at bar are wholly inconsistent with the purposes of sentencing in 18 U.S.C. § 3553(a)"); <u>U.S.</u>
17   <u>v. Fernandez</u> 436 F.Supp.2d 983 (E.D. Wisc.  2006) (where defendant had two prior sales when he was 20,
     and was a was career offender with,  guideline range of  188-235 months is "greater than necessary" to
18   satisfy purposes of sentencing. Absent career offender, guidelines would be 87-108 months, and court
     imposes 126 months sentence in part because Sentencing Commission study shows that in cases involving
19   low-level street dealers, c/o status  will often produce a sentence far longer than any previous sentences -
     one greater than necessary to deter the defendant from committing further crimes); <u>United States v.</u>
20   <u>Mishoe</u>, 241 F.3d 214, 220 (2d Cir. 2001) ("In some circumstances, a large disparity [between the length
     of the prior sentences and the sentence produced by the guideline] might indicate that the career offender
21   sentence provides a deterrent effect so in excess of what is required . . . as to constitute a mitigating
     circumstance present 'to a degree' not adequately considered by the Commission.");<u>United States v. Rivers</u>,
22   50 F.3d 1126, 1131 (2d Cir. 1995) (stating that the district court can depart where the range created by the
     career offender provision overstates these seriousness of the defendant's record); <u>United States v. Qualls</u>,
23   373 F. Supp. 2d 873, 876-77 (E.D. Wis. 2005) (stating that in some cases the career offender guideline
     creates sentences far greater than necessary, such as where the qualifying offenses are designated crimes of
24   violence but do not suggest a risk justifying such a sentence, or where the prior sentences were short,
     making the guideline range applicable to the instant offense a colossal increase); <u>U.S. v. Phelps</u>, 366 F.
25   Supp. 2d 580, 590 (E.D.Tenn. 2005) (stating that "it is not unusual that the technical definitions of 'crime
     of violence' and 'controlled substance offense' operate to subject some defendants to not just substantial,
26   but extraordinary increases in their advisory Guidelines ranges," which in some cases will be greater than
     necessary, especially where "the defendant's prior convictions are very old and he has demonstrated some
27   ability to live for substantial periods crime free or in cases where the defendant barely qualifies as a career
     offender"); <u>U.S. v.Carvajal</u>, No. 04-CR-222, 2005 U.S. Dist. LEXIS 3076, at *15-16 (S.D.N.Y. Feb. 22,

28   SENTENCING MEMORANDUM              22

1    <u>Family ties</u>. Finally, a reduction is warranted based
2    upon his extremely strong family ties. <u>U.S. v. Wachowiak</u> 412
3    F.Supp.2d 958  (E.D. Wisc.  2006) (where guidelines 120 20
4    151 months, below guideline sentence of 70 months imposed in
5    part because "the guidelines failed to account for the
6    strong family support defendant enjoyed, which would aid in
7    his rehabilitation and re-integration into the community.
8    Because defendant's family and friends have not shunned him
9    despite learning of his crime, he will likely not feel
10   compelled to remain secretive if tempted to re-offend.
11   Rather, he will seek help and support")

12   The 3553 Factors in total combine for the sentence
13   requested by the defense.

26   2005)(finding that the career offender guideline produced a sentence greater than necessary under §
     3553(a)).

28   SENTENCING MEMORANDUM            23

## CONCLUSION.

Before the Court is a young man with no prior criminal record. He faces a lengthy prison sentence. Without consideration of the charged crime he is an exemplary young man, from an exemplary family. He is now convicted of an extremely high profile crime, and will face intense pressure when incarcerated; he is no longer the young man he was before this case was brought, both physically, emotionally, and mentally.

The foregoing factors, the exhibits and authorities referenced in this Sentencing Memorandum, compel the sentence requested by the defense in this case.

At the time of sentencing the defense will request a certain designation for incarceration and for bail pending the potential appeal.

Respectfully submitted

DATED: May 1, 2008.

MARK J. REICHEL
ATTORNEY AT LAW
Attorney for defendant

/s/

Mark Reichel

SENTENCING MEMORANDUM                24