```
 1  Shari Rusk, Bar #170313
    Attorney At Law
 2  1710 Broadway, # 111
    Sacramento, California 95818
 3  Telephone: (916) 804-8656
    rusklaw@comcast.net
 4
    Attorney for Defendant
 5  ZACHARY JENSON
```

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR-S 06-035-MCE |
| Plaintiff, | **SENTENCING MEMORANDUM** |
| v. | |
| ZACHARY JENSON, | Date: December 4, 2008 |
| | Time: 9:00 a.m. |
| Defendant. | Hon. Morrison C. England |

## I. INTRODUCTION

Defendant Zachary Jenson comes before this Court for sentencing on a conviction for Conspiracy in violation of 18 U.S.C. § 371. Mr. Jenson pled guilty to conspiring with his co-defendants, Eric McDavid and Lauren Weiner on behalf of "ELF" the earth liberation front to engage in direct action as a form of environmental protest. Mr. Jenson almost immediately admitted his role and cooperated with the government up to and including testifying against his co-defendant, McDavid, at trial. This memorandum will focus on the events in Mr. Jenson's life leading up to meeting his co-defendants; Mr. Jenson's particular role in this offense and finally, his extraordinary post-offense conduct.

## II. BACKGROUND

Zachary Jenson grew up in Washington State in what his parents describe as a dysfunctional home. When Zach was just seven years old he suffered a seizure due to an "abnormal cluster of blood cells deep in his brain". (PSR at p. 16, ¶ 63). As a result of this, he had to be on prescribed medicine for the next three years. Mr. Jenson was subjected to regular MRIs until he was 17 years old, at which time he no longer had insurance coverage.

At age 18, Mr. Jenson's parents divorced. Neither of them could provide him a place to stay, any financial assistance or emotional support. Both Mr. Jenson's parents were struggling themselves. His mother relocated to Tennessee. With no place to stay in the State of Washington, Zach began to travel. He hopped trains and ate from discarded trash. He had no means of support and dreamed of being a writer.

While a student, from elementary to High School, Zach was often described as a follower, as someone who was easily led. Zachary Jenson was thin and small for his age. He was frequently taunted at school and so alienated that his parents ultimately switched him to a private Christian school. Through out his teen years, Zach was interested in writing and poetry. He did not have any developed political philosophy.

While traveling and attending peaceful environmental protests, Zach met Eric McDavid. By all accounts the 28 year old McDavid was a charming and charismatic companion, described as a "true believer" in the causes about which he was passionate. The young Zach Jenson fell sway to the older McDavid as he was deeply impressed by him and thrilled to have a friend. As this Court is well aware, Mr. McDavid and Mr. Jenson met a young woman named Anna along the way. This Court has heard ample testimony on the role Anna played in conjunction with Zach, Eric and Lauren Weiner.

When Anna, the government informant, rented the Dutch Flats cabin,

Zachary Jenson finally found himself with a place to live.  He had friends and food to eat.  Zach Jenson could not contribute a single cent to the foursome's living expenses, because he didn't have one.  All Zach had was the roof over his head, thanks to his new "friends" and literally no place else to go.

### III. THE OFFENSE CONDUCT

The offense for which Mr. Jenson was convicted was indeed serious.  No one understands that better than Mr. Jenson.  He has suffered deep and genuine remorse over his actions in this case.  While no one was hurt and no plan ever came to fruition, Mr. Jenson is fully aware that the ideas he and his co-defendants discussed, if carried out, could have led to harm to others.  That is not something Zachary Jenson ever wanted.  Much of the offense conduct was tape recorded by the informant, Anna.  There was lengthly trial testimony about the various roles these individuals played in this scheme.  Mr. McDavid argued that Anna was in control.  The government argued it was McDavid who ran the show, but no one ever suggested Zachary Jenson was anything other than a meek follower.  Mr. Jenson repeatedly denounced any form of violence and distanced himself from the others when it was suggested.

Mr. Jenson had to be prodded by his co-defendants to pay attention, to speak, to participate in any planning or disscusions.  The vast majority of the time in the Dutch Flats cabin, Mr. Jenson was apart from the others, in another room, smoking pot and reading. Mr. Jenson often admonished the group that they were moving to fast, that they should slow down.  When pressed for suggestions for direct action, Mr. Jenson finally suggested some sort of black out, like N.Y.C., where people came together.  His tone was hesitant and his cohorts reflected this reluctance by accusing him of being too quiet, too distant and not really part of the group.

When Lauren Weiner and Anna traveled in Philadelphia together, they

3

discussed Zach Jenson's lack of committment and his passivity.  They
discussed the fact that he was the least involved in planning of any of them.
They questioned his committment to their group and their cause and whether
he should be allowed to remain in the group.  Indeed, after all the trial
testimony and the conviction of Mr. McDavid, one juror questioned what Zach
Jenson could possibly have been convicted of and stated that he should have
been acquitted.  When Mr. Jenson heard of these remarks, he expressed
incredible remorse that he participated in discussions about "blowing things
up" even if he did not really want to go through with it.  If anything had
happened, Mr. Jenson would have suffered life long guilt, even as an
observer.  At one point the group discussed throwing jam jars on a highway as
a way of making a statement.  Upon reflection, Zachary Jenson was horrified
that innocent children in cars could have been hurt or killed by such an
extraordinarily foolish idea.

While Mr. Jenson was informed by attorneys that he had what might be
considered a viable legal defense, he was steadfast that he wanted to
cooperate with the government, right his wrongs and distance himself from the
philosophy that led him to participate in this conspiracy.  Here is a
sampling of material from the transcribed tapes made during the period of
this conspiracy.  The participants refer to Zachary Jenson by the nickname
"Ollie".

PH 1D15 Session 2: 1/9/06; 12:36:18 – 12:45:43

Anna: How you doing, Ollie?

Zach: Still thinking, taking it in.


Eric: Alright, accidental death of civilians. . . Do you want to start out?

Zach: I was thinking like if that ever happened, stop immediately.  Stop
whatever we're doing.

| | |
|---|---|
| 1 | Eric: Did you hear the question? |
| 2 | Zach: What was the question? |
| 3 | Eric: The one that Anna asked you? |
| 4 | Zach: What? |
| 5 | Anna: What do you think about all this? |
| 6 | Zach: About accidental death? |
| 7 | Anna: Yeah, when you said 'abort', do you say like abort the operation and |
| 8 | leave town immediately, or are you saying pull the plug on everything. |
| 9 | Zach: I was thinking 'pull the plug' on everything.  I just, I don't know, I |
| 10 | was thinking I don't really wanna be associated at all with murder. |
| 11 | |
| 12 | Anna: Come on Ollie.  Come on. You okay, Ollie?  What's wrong? |
| 13 | Zach: I don't know.  I need to articulate some thoughts.  I'll let you know. |
| 14 | |
| 15 | 1D4 Disk/Session 4 11/19/06; 16:46:44. The night prior to the arrests: |
| 16 | Zach: I'm feeling like really overwhelmed. |
| 17 | |
| 18 | |
| 19 | Anna: I don't understand why Ollie never has a position. |
| 20 | Eric: He's driving me f—ing nuts. |
| 21 | Anna: How all he's [Ollie] doing is eating mushrooms and he's searching for |
| 22 | something and he's so lonely. |
| 23 | |
| 24 | 1D2 Session 2, 11/20/05; 11:36:22 - 12:44:50 PST |
| 25 | Anna: Have you thought any more about the targets for you, Ollie? |
| 26 | Zach: No, not yet. |
| 27 | |
| 28 | Anna: What about you, Ollie? |

5

```
 1    Zach: Huh?
 2    Anna: What do you think?
 3    Zach: About what?
 4    Anna: About timelines, material gathering and recon?
 5    Zach: I don't know.  I can't work with timelines.
 6
 7    Conversation between Lauren and Anna 11/4/05; File Label PH 266H-PH-99771,
 8    WPC # 1504T05(cc), PHCM# 11206-NT. Discussion ensues about the difficulty of
 9    getting Ollie to say anything:
10    Anna: He's [Ollie's] like lost a lot of his individuality and in some ways
11    has been kind of a carbon copy of Eric and in other ways has just like
12    totally lost any and all control and motivation.
13    WPC #1505T05 11/4/05
14    Anna: Do you think he's [Ollie's] gotten in over his head?
15    Lauren: Harder than he ever expected.
16    Anna: Okay. . . now he's just running away.
17    Lauren: Yeah, got, like, everything's moving too fast for him right now.
18    Anna: Okay.
19    Lauren: That's why he doesn't talk a lot, that's why he doesn't, but also I
20    don't know if he's where he wants to be like. . . Ever since I've known him,
21    I've never seen him take leadership roles.
22
23    Anna: Do you have any idea how, you're right, he really has absolutely zero
24    idea of what's going on.  He has no comprehension of the scope.
25    Lauren: You know, stuff like that, like, I don't think Ollie has any idea
26    what he agreed to get into.
27    Anna: It's just, yeah, I, I think you're exactly right, I think Ollie has no
28    comprehension.
```

Sadly, this sampling of tapes from the government's evidence demonstrates that Anna was correct in her view that Ollie (Zach) had no comprehension of the scope of this conspiracy and its potential impact and was in way over his head. This lonely young man was befriended by an informant and zealous advocates of a position for which Zach had no conviction. He wanted food, a roof over his head and friends at a time when his family was unavailable to him. He made the choice to be with them and for that he fully accepts his felony conviction. Given all the circumstances of this case, probation is the appropriate sentence.

In the wake of United States v. Booker, 543 U.S. 220 (2005), and its progeny, Gall v. United States, 128 S.Ct. 586 (2207) and Kimbrough v. United States, 128 S.Ct. 558 (2007), sentencing courts must be encouraged to take a new look at the Guidelines' treatment of probation as a sentencing option and independently determine in individual cases whether probation is statutorily mandated - that is, "minimally sufficient," see, United States v. Serafini, 233 F.3d 758, 776 (3d Cir. 2000) - sentence in each individual case. This approach to probation is consistent with the mandate of the Sentencing Reform Act, recent pronouncements by the Supreme Court, and social and public policy recognizing the benefits of punishing individuals through alternatives to incarceration.

### IV. POST OFFENSE CONDUCT

Mr. Jenson's conduct since his release from County Jail has been exemplary. Zach Jenson found work at a pizza place in Washington. As evidenced by letters from both his General Manager, Mark Jacobson and the owner, Michael Pocock, he has avoided trouble and done an excellent job. Initially, his manager was reluctant to hire him due to the nature of these charges. He took a chance on Zach Jenson and was greatly impressed. Zach

was soon promoted to assistant manager. He's described as a very hard worker, ethical, trust worthy and resourceful. When other employees occasionally got into trouble, Zach Jenson stayed far away from the lure of their antics. Mr. Jenson's pre-trial services officer in Washington, Annelise Johnson, was impressed enough with Mr. Jenson's behaviour to write a letter on his behalf, as was his third party custodian, T.C. Pritchett.

Not only has Zach Jenson complied with every rule and restiction placed upon him, but as restrictions were lessened, he rose to the occasion and accepted greater responsibilities. Despite being a nearly constant pot smoker prior to his arrest, he cleaned up his act and has not ever had a single positive drug test. Though Mr. Jenson is only in his early twenties and only working at a pizza place, he sends money to his mother, now in New Mexico and has helped support his father and his younger brother. Mr. Jenson gave his mother $1,500 to pay her mortgage. He gave his younger brother $200. Mr. Jenson is in a steady relationship with his girl friend, Sarah. When she needed a place to live, he leased a house for his father, Sarah and himself for $2,300. Mr. Jenson is hard working and selfless. He has not only been gainfully employed, following all the rules, but he's been helping support his family and others.

No one who has encountered Mr. Jenson in the last two years has failed to be impressed with the changes that he has made. He is responsible and mature beyond his years and light years away from where he was at the time of his arrest. Mr. Jenson no longer associates with anyone from the ALF or ELF movements. He writes about achieving goals through peaceful means such as education and writing and awareness. Zachary Jenson today, at 23 years old is not the same person he was at 18, when he left home.

It is unusual to request probation in a case such as this. Zachary Jenson made a terrible mistake at a young age. He completely lacked parental

guidance or support.  He has suffered a felony conviction as a result of
this.  He spent time in Sacramento County Jail.  He lost all of his friends
and greater support system when he testified against Eric McDavid, a move
considered to be a treacherous betrayal by all those he was closest to at the
time.  Zachary Jenson was completely truthful and without guile on the
witness stand.  His temperment  was the same calm, compliant, passive young
man that he truly is.  Zachary Jenson must and should pay for his mistakes.
He has been on restrictive pre-trial release with random drug testing
conditions, no computer use (which serious limited his employment prospects
and his writing) and limits on his associations.  Mr. Jenson has met and
exceeded all expectations.  He hasn't just followed the rules and stayed on
the straight and narrow, he's put himself out to help those around him - even
those who were unavailable to help him when he needed it most.  Zachary
Jenson long ago realized the error of his ways and would never again engage
in conduct like this.  He is no longer susceptible to the magnetism of
others.  He is not dangerous.  He is helpful and sincere.  Society will not
be served by putting this young man in prison.  Mr. Jenson's talents and
abilities are much better served by his writing and speaking about the
corruption of the movement that he was part of and steering other young
people away from that path.  He is precisely in a position to reach out and
help save someone like himself.  His experience gives him credibility with
young people attracted by these movements and he could, perhaps, avert a
similiar situation from reprising itself.

    Even prior to Booker, sentencing courts departed down for post-offense
rehabilitation.  See, United States v. Tzoc-Sierra, 387 F.3d 978 (9th Cir.
2004); United States v. Thompson, 315 F.3d 1071, 1077 (9th Cir. 2002)(Post-
offense rehabilitation is an appropriate basis for a downward departure).  As
recently as July of 2008, the Ninth Circuit held a sentencing variance was

9

warranted based upon the defendant's good post-offense conduct. See, United States v. Whitehead, 532 F.3d 991 (9th Cir. 2008)

The thoughtful and well analyzed pre-sentence report prepared in this matter recommends a sentence of 24 months. The maximum sentence the Court can impose is 5 years. For all the reasons stated herein, the defendant respectfully requests a sentence of probation.

## V. POST-*BOOKER* SENTENCING PROCEDURE

In United States v. Booker, 543 U.S. 220 (2004), the Supreme Court created the unusual remedy of severing and excising the Sentencing Reform Act's provisions concerning the mandatory nature of the guidelines, thereby making the guidelines "effectively advisory." *Id*. at 245.

In light of Booker, a sentencing court is no longer bound by the policy statements or guideline range calculated under the Sentencing Guidelines Manual. The guidelines are still "the starting point and the initial benchmark." Kimbrough v. United States, 128 S.Ct. 558, 574 (2007). But the district court may not presume that the Guidelines range is reasonable and should not give the Guidelines factor more or less weight than other of the § 3553(a) factors. United States v. Carty, No. 05-10200, 2008 U.S. App. Lexis 6084 (9th Cir. Mar. 24, 2008) (en banc). The old restrictive departure scheme is no longer valid, though parties may still "argue that the Guidelines sentence should not apply 'perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the 'heartland' to which the Commission intends individual guidelines to apply, U.S.S.G. § 5K2.0, perhaps because the Guidelines sentence itself fails to properly reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless." Carty, 2008 U.S. App. Lexis at *18 (*quoting* Rita v. United States, 127 S.Ct. 2456, 2465 (2007)).

Ultimately, after considering the guideline range, the Court must impose an appropriate sentence in light of the sentencing factors set forth in 18 U.S.C. § 3553(a). Section 3553(a) states that sentencing courts "shall impose a sentence sufficient, but not greater than necessary, to comply with the" sentencing purposes set forth in this section. In doing so, the Court "shall consider," in addition to the Sentencing Guidelines, the following factors:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed--

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available; . . .

(6) the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Congress intended the courts to first determine *whether* to imprison in light of the characteristics of the defendant, the circumstances of the offense, and all of the purposes of sentencing, considering probation as one of the "kinds of sentences available." 18 U.S.C. § 3553(a)(1),(2),(3). Congress further directed both the Commission and the courts not to use prison for the purpose of rehabilitation if the other purposes of sentencing did not require incarceration. See, 28 U.S.C. § 994(k); 18 U.S.C. §

11

3582(a); S. Rep. 98-225 at 119, 176 (1983).

The Supreme Court has admonished sentencing courts to "consider every convicted person as an individual," remaining mindful that a sentence of imprisonment "may work to promote not respect, but derision, of the law, if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." Gall, 128 S.Ct. At 598-99.

VI. CONCLUSION

For all these reasons, the Court should sentence Zachary Jenson to probation. Despite Jenson's serious offenses, in this case a felony conviction and a sentence of probation is adequate to serve the sentencing goals of punishment, deterrence, and rehabilitation. 18 U.S.C. § 3553(a) ("The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing).

Respectfully submitted,

Dated: November 25, 2008

/s/ Shari Rusk
SHARI RUSK

Attorney for Defendant
ZACHARY JENSON